```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

IN RE INTERNATIONAL            )
GOSPEL PARTY BOOSTING JESUS    )    CIVIL ACTION NO.
GROUPS, INC.,                  )    12-10545-DPW
                               )
         Debtor.               )    ON APPEAL FROM BANKRUPTCY NO.
                               )    10-19012-HJB

                       MEMORANDUM AND ORDER
                          August 10, 2012

Jeff Ross appeals from the January 24, 2012 decision of the United States Bankruptcy Court denying his requested "co-broker" commission payment for real estate he purchased from a bankruptcy estate. For the reasons below, I affirm the Bankruptcy Court's award.

## I.  BACKGROUND

A.  Facts[1]

In 2010, International Gospel Party Boosting Jesus Groups, Inc. filed for chapter 11 bankruptcy and the Bankruptcy Court appointed a trustee. On January 14, 2011, the Trustee filed an application to appoint Cabot & Company as real estate brokers for the sale of 554 Massachusetts Avenue, Boston, Massachusetts. The application stated that Cabot would split any commission it earned with a co-broker or agent of the buyer, if one was used.

---

[1] The facts are not in dispute in this appeal. The following recitation comes largely from the Bankruptcy Court's January 24, 2012 Memorandum of Decision concerning Ross's motion for reconsideration. *See In re Int'l Gospel Party Boosting Jesus Groups, Inc.*, 464 B.R. 78 (Bankr. D. Mass. 2012).

The Bankruptcy Court approved the retention of Cabot on February 1, 2011, but conditioned any fee to be paid to Cabot on an application to the Bankruptcy Court and an order approving the application.

On April 13, 2011, the Trustee moved for an order authorizing the sale of 554 Massachusetts Avenue to Robert Alessandro for $1,135,000 with a $56,750 broker's fee. The purchase and sale agreement attached to the Trustee's filing stated, in part, that:

> Seller shall pay to Cabot and Company ("Broker") a broker's commission equal to five percent (5%) percent [sic] of the Purchase Price as of the Closing Date in connection with the sale transaction contemplated hereby ~~to be divided equally between the Broker and _____ ("Co-Broker")~~, which commission shall only be due in the event this transaction closes in accordance with terms hereof and the full consideration is paid and the Broker's commission is approved by the United States Bankruptcy Court for the District of Massachusetts in case no. 10-19012. Purchaser and Seller represent to each other that the Purchaser and Seller have not been contacted by or dealt with any broker, finder or intermediary of any kind in connection with the transaction contemplated hereby other than Broker ~~and Co-Broker~~.

(strikethroughs in original). On the same day, the Trustee filed a Notice of Intended Private Sale (the "Sale Notice") of the property, which stated that "[h]igher offers must be on the same terms and conditions provided in the purchase and sale agreement, other than the purchase price." The purchase and sale agreement referenced in the Sale Notice was the agreement involved in the potential sale of the property to Alessandro.

On May 23, 2011, Jeff Ross, a licensed real estate broker looking to relocate to the area, filed a notice with the Bankruptcy Court that he offered $1,186,000 for the property. Ross's counteroffer represented it was "in conformance with the [Sale Notice]," but it included a purchase and sale agreement which was not identical to the purchase and sale agreement attached to the Trustee's filing because it re-instated the stricken language above:

> Seller shall pay to Cabot and Company ("Broker") a broker's commission equal to five percent (5%) of the Purchase Price as of the Closing Date in connection with the sale transaction contemplated hereby *to be divided equally between the Broker and Jeff Ross ("Co-Broker")*, which commission shall only be due in the event this transaction closes in accordance with terms hereof and the full consideration is paid and the Broker's commission is approved by the United States Bankruptcy Court for the District of Massachusetts in case no. 10-19012.  Purchaser and Seller represent to each other that the Purchaser and Seller have not been contacted by or dealt with any broker, finder or intermediary of any kind in connection with the transaction contemplated hereby other than Broker *and Co-Broker*.

(emphasis added).

After a hearing the next day, Ross increased his offer to $1,326,001 and was declared the winner over two other bids (Allesandro's in the amount of $1,226,000, and a bid from Neelon Properties LLC in the amount of $1,185,000).  On June 9, 2011, the sale was approved by the Bankruptcy Court.

B.  Procedural History

On June 21, 2011, Cabot filed an application for a broker's fee of $66,300.05, or 5% of the $1,326,001 sale price, with the Bankruptcy Court. Its application disclosed that "pursuant to a co-broker arrangement with Jeff Ross, any commission received will be divided with Jeff Ross, with Cabot & Company receiving 50% of the total and Jeff Ross receiving 50%," or $33,150.33.

The Bankruptcy Court held a hearing on September 6, 2011 on Cabot's application. After the hearing, it granted Cabot's application, but limited Cabot's fee to $33,150.33, and denied the application as to any allowance for Ross. Ross filed a motion for reconsideration on September 16, 2011. The Bankruptcy Court denied Ross's motion on January 24, 2012, and issued a memorandum explaining its decision.

In its memorandum, the Bankruptcy Court gave three reasons why Ross's co-broker commission was properly denied. First, the Bankruptcy Court noted that Ross's assertion that he had adequately disclosed his co-broker status was "disingenuous." "Although the Ross Counteroffer represented that it was 'in conformance with the [Sale Notice],' and, therefore, 'on the same terms and conditions provided in the [original purchase and sale agreement],' this was not true" because, as noted above, Ross re-instated the stricken portions of the broker's fee section of the agreement. *In re Int'l Gospel Party Boosting Jesus Groups, Inc.*,

4

464 B.R. 78, 81 (Bankr. D. Mass. 2012). Second, the Bankruptcy Court noted that the Sale Order, in which it allowed the sale of the property to Ross, explicitly defined the Purchase and Sale Agreement that it was approving as the initial Purchase and Sale Agreement, not the one that Ross edited and attached to his counteroffer. *Id.* at 84. Finally, the Bankruptcy Court held that the proposed division of Cabot's broker's fee and payment to Ross could not be characterized as a co-broker's commission, because Ross was not acting as a buyer's broker in the transaction but was instead acting as principal. While "Cabot was authorized by [the Bankruptcy] Court's allowance of its Employment Application to share its commission with a broker[,i]t was not authorized to share its commission with a buyer. The former is a co-brokerage. The latter is akin to a kickback." *Id.* at 85.

Ross appealed to this court.

## II. STANDARD OF REVIEW

When reviewing a bankruptcy court's order under 28 U.S.C. § 158, I review legal conclusions *de novo* and factual findings for clear error. *In re Redondo Const. Corp.*, 678 F.3d 115, 120-21 (1st. Cir. 2012). "[C]onsiderable deference" is given to the bankruptcy court's "factual determinations and discretionary judgments . . . involved in calculating and fashioning appropriate fee awards." *In re DN Assocs.*, 3 F.3d 512, 515 (1st

Cir. 1993). The Bankruptcy Court's findings of fact, therefore, are not to be set aside if they are "supportable on any reasonable view of the record." *In re Carp*, 340 F.3d 15, 22 (1st Cir. 2003).

### III. ANALYSIS

Ross argues that because he performed the work of a broker in the transaction and his co-broker status was fully disclosed to the participants, the Bankruptcy Court's denial of the requested broker's fee must be reversed.

Under 11 U.S.C. § 328, the trustee "may employ or authorize the employment of a professional person . . . on any reasonable terms and conditions of employment." However, "[n]otwithstanding such terms and conditions, the [Bankruptcy C]ourt may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). Under section 330, the Bankruptcy Court has the explicit power to "award compensation that is less than the amount of compensation that is requested" in an application from a professional working for the trustee, and is prohibited from allowing "compensation for [] unnecessary duplication of services; or [] services that were not . . . reasonably likely to benefit the debtor's estate;

or [] necessary to the administration of the case." 11 U.S.C. §§ 330(a)(2) & (4).

Consistent with these statutory provisions, numerous clauses in the various purchase and sale agreements and other documents involved in the bankruptcy sale made clear that the amount of the broker's fee would be determined upon application to the Bankruptcy Court. Indeed, even the modified purchase and sale agreement that Ross submitted with his counteroffer acknowledged that the Bankruptcy Court had the ultimate say on the broker's commission to be paid after the sale.

Ross argues that he performed the work of a buyer's broker in this transaction, claiming that "he researched available properties and located the property on his own, performed his own market analysis of the value of the property, and went so far as to perform all of the functions typically performed by any real estate broker to effect a real estate closing, such as performing all the work necessary himself to obtain a certificate of compliance with smoke detector regulations ("6D Certificate")." All these activities, even arranging for the smoke detector certificate, are things every prospective purchaser of a home may find himself undertaking when without a broker. Thus, I must determine whether the Bankruptcy Court erred in its implicit finding that Ross did not earn a broker's fee as he was merely a principal.

7

The Bankruptcy Court's finding that Ross was acting as a principal in this transaction is supported by the evidence and is undisputed by Ross, who only claims that he was simultaneously acting as his own broker. As the Bankruptcy Court observed, Ross was not acting as a broker, but instead as a principal; "[a] broker is one who acts as an agent for another:

> The most important determining factor of what constitutes a 'broker' is whether the party is dealing for itself or for another. A broker . . . does not deal on its own account. Two preliminary requirements must be met for a finding that an individual is acting as a broker: (1) the person is acting for compensation; and (2) the person is acting on behalf of someone else."

464 B.R. at 85 (quoting BLACK'S LAW DICTIONARY 219 (9th ed. 2009) (quoting 12 AM. JUR. 2d *Brokers* § 1 (1997))).

Implicit in the Bankruptcy Court's finding, that Ross was acting as a principal, is a further finding that any other services Ross provided in his "co-broker" capacity were neither necessary to the administration of, nor beneficial to the estate. That circumstance, in turn, gives rise under section 330 to the Bankruptcy Court's power to adjust the broker's fees to be paid in the sale, and to eliminate Ross's share of those fees. Its decision to do so here was not erroneous.

## IV. CONCLUSION

For the reason set forth above, I AFFIRM the Bankruptcy Court's award.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE